Moncure, P.
This is an appeal from a decree of the Circuit court of the city of Richmond in three suits, the styles of which were “Mayo v. Carrington,” “ Coutts v. Mayo,” and “ Coutts’ adm’r v. Mayo,” the printed record of which contains 550 pages. The difficulty of deciding it is necessarily very great, and is much increased by the obscurity arising from lapse of time, the extraordinary laches of most of the parties concerned, and the death of all the original actors in the transactions which gave rise to the suits. The subject of controversy is what is familiarly known by the name of the “Sandy bar;” which was at one time, as its name imports, a mere sand bar, valuable in itself i only for the sand it afforded, yet so valuable, even for that, as to afford an annual rent of $450. And there was then appurtenant to it a fishery, which was so valuable as to yield, for a short time at least, an annual rent of $1,000. But the fishery soon diminished in value, and has long since become utterly valueless. If this bar was then worth any thing for any other purpose than the sand and the fishery, in the estimation either of the parties concerned or the public, it was only in its connection, if it had any connection, with “ Coutts’s ferry,” to which it was in close proximity, and which was then held by the same owner. That ferry was across James river, between Richmond and Manchester, and just below “ Mayo’s bridge.” It was therefore, naturally, a subject of interest to the proprietor of that bi’idge, which has always belonged to the *77 appellants and their ancestors. But the ferry has long since gone down and ceased to have any existence. The sandy bar, which in the origin of the aforesaid was thus of limited value, has long been increasing in value by reason of improvements, public and private, and is now, it seems, very valuable. It is situated on James river, nearly opposite the centre of the city, is lot Ho. 341 in the plan of Byrd’s addition to the city, and the Richmond dock occupies a part of it. Many buildings have been erected upon it, which now yield a large amount of rent. These changes have had the effect of waking up the parties concerned from their long sleep, and stimulating them to enquire into their rights. Hot being able to settle those rights themselves, they have invoked the aid of the courts for that purpose, and it now devolves on this court to decide the questions of controversy between them. Difficult as that duty is, we must address ourselves to the work and perform it as well as we can. After all, we can hardly expect to effectuate perfect justice in the ease.
The representatives, real or personal, of four persons long since deceased, are conflicting claimants of the subject in controversy, or an interest therein. First, George M. Carrington; secondly, Edward C. Mayo; thirdly, Jane Coutts; and fourthly, Patrick Coutts. "We will consider the claims of these in their order. And,
First, George M. Carrington. He and his representatives and assigns have been in the possession and enjoyment of the subject ever since the year 1833,. claiming to he entitled to a term for years therein which will expire on the 10th day of February 1876; and also claiming a right to set off' against the rent,, accrued and accruing, or hereafter to accrue during all that time, so much as may he necessary of the debt due by Patrick Coutts to James Winston, claimed to be secured by the deed of trust from said Coutts to Cole *78 man an¿j_ Otis of the 8th of November 1819, and to charge the balance remaining, or which may remain, unpaid of that debt, after crediting the rents aforesaid, the subject itself, upon the ground that the said debt, with the said right of set off, was sold and assigned to said Carrington along with the said term, and that the annual rent is insufficient to keep down the annual interest upon the balance due on account of the said debt. We will now examine his chain of title, link by link, and see whether, and to what extent, it is sufficient to sustain his claim.
Patrick Coutts is 'the source from whom all the conflicting claims in this case arise, and it will therefore be unnecessary to trace the title beyond that source. It may be proper to say, however, that he derived it under a marriage settlement between his father and mother, Reuben and Jane Coutts, dated the 10th day of September 1799, which created a charge iipon all the property conveyed by that settlement, to secure an annuity for life of five hundred dollars to said Jane Coutts, who lived until some time in 1831. But as there is no claim in this case on account of that annuity, no further notice need be taken of it. The links then in the claim of Carrington’s title under Patrick Coutts are as follows :
1st. The lease dated the 16th day of March 1815, from Patrick Coutts, Me Craw, surviving trustee in the marriage settlement aforesaid, and Jane Coutts to James and Pleasant Winston, demising to them the said Winstons, the said “ Sandy bar,” “with liberty to use and to carry away, sell or otherwise dispose of, so much sand of or from the said sandy bar as they the said James and Pleasant Winston,” &c. “mayor shall find it convenient or necessary to use, take, carry away, sell or otherwise dispose of, with the exception of so much sand as the aforesaid Patrick Coutts, his executors,” &c. “may find necessary or expedient for his or *79 their own proper use,” &c.: “To have and to hold the Baid sandy bar (except as before excepted), as to the full and free use of sand from the same as -and none other, unto the said James and Pleasant Winston,” &c., “from the first day of April next ensuing the date hereof, for and during and to the full end and term of 20 years, yielding and paying therefor unto the said McCraw as trustee for the uses expressed in said trust,” &c., “the yearly rent or sum of $450,” &c., “in the following manner,” &c. The lease contains a proviso for re-entry for non-payment of rent, or if no sufficient distress should be found on the premises, and also a provision for the surrender of the lease by the lessees upon giving to the said “ McCraw, trustee as aforesaid, or to the said Patrick Courts, his heirs or assigns, six months previous notice in writing of such intention.” The only remaining clauses of the lease which it is material to notice are the following: “And it is hereby understood, covenanted and agreed,” &c. “ that the only interest or right intended by these presents to be demised,” &c. “is the full and perfect liberty to use, take, carry away, sell or dispose of, and enjoy the sand of the said premises, together with the fish house now erecting on the said sandy bar in the manner and time hereinafter covenanted and agreed upon, in as full and ample a manner as the said lessees might lawfully enjoy the same, according to the true intent and meaning of these presents (excepting as before excepted) to the exclusion of every interest whatever and particularly all interest and right in or to the ferry and the aforesaid fishery, each and both of which the said McCraw, trustee as aforesaid, hereby wholly reserves from the operation of the lease.” “And also that it shall and may be lawful to and for the said J. & P. Winston, their” &c., “to occupy, possess and enjoy the fish house erecting upon the said .sandy bar (as soon as the same shall be finished) during *80 the following months of each and every year of the ° J J aforesaid term of 20 years, and for and during no other time,” viz. “June, July, August, September, October, November, December, January and February.” — “And should they the said J. and P. Winston, their” &c., “be disposed to erect or put any other additional buildjngg thereon, it shall and may be lawful to and for them, or either of them, their” &c., “to erect or put a house or houses on any part of the said sandy bar, or in any way to improve the said premises by watling or any other ways or means whatever, so as to enable them the said J. & P. Winston, their” &c., “to catch or procure as much sand as possible. And should the said J. & P. Winston, their” &e., “surrender the premises as aforesaid, at any time before the expiration of the term of 20 years before mentioned,” “ then and in that case the said P. Coutts, his heirs,” &c., “shall and will well and truly pay or cause to be paid to them the said J. & P. Winston, their” &c., one-half of the value of any house or houses and the appurtenances to the same,” which may have been so erected, and be upon the premises at the time of such surrender, to he ascertained in the manner prescribed in the lease.
It was contended that this lease was in effect only a license to the lessee and his assigns to get sand from the demised premises during the term, and that only such privileges, by making improvements or otherwise, were intended to be conferred on the lessee, &c., as were convenient to the business of getting sand. The literal terms of the lease seem to support that view. But if that had been the only intention of the jiarties, it would have been much more aptly expressed by giving a mere license to enter and take sand, instead of conveying the estate during the term. If such a mere license had been given, the estate would have remained in the lessor, subject only to the license. Whereas the estate is conveyed to the lessee during the term, with *81 liberty to tbe lessees (which they would not have had if it had not been expressly given) to use and carry away, sell or otherwise dispose of the sand at pleasure, the exception of so much thereof as Patrick Coutts, or his assigns, might find necessary or convenient for his or their own proper use, the right to take and remove which is expressly reserved in the lease — an exception and reservation which would have been wholly unnecessary if the only purpose of the parties had been to confer a license to take and carry away sand. The peculiar terms of the lease which gave rise to the objection we are now considering, were no doubt occasioned in this way. The sandy bar was of no value at that time except for these purposes, 1st' for getting sand, 2dly, for the fishery which was appurtenant thereto, and 3dly, on account of the ferry, which was in some way connected therewith. The fishery and the ferry were considered very valuable, and the lessors were very anxious to guard them as much as possible against any claim or interruption on the part of the lessees or their assigns. The sandy bar is therefore leased only for the first of the three purposes aforesaid, for which alone it was deemed to be of any value, and not for the 2d or 3d, which are expressly reserved, and excluded from the operation of the lease. Although the improvements which the lessees are authorized by the lease to make, seem to refer only to the business of getting sand, no doubt because it was supposed that there could be no inducement for making any other, yet it cannot be supposed that the lessees were intended to be restricted in any manner in the making of any improvements which would not intei’fere with the fishery or the ferry. There could have been no motive for such a restriction, for every permanent improvement put upon the property, not interfering with the fishery or the ferry, would benefit the lessors as well as the lessees. The lessors certainly had no right to enter *82 the demised premises during the term for the purpose of making improvements, except in connection with the fishery or the ferry. The only right of entry which they had, except for the purposes of the fishery or ^eriT> was right reserved to Patrick Coutts and his assigns, to enter and take sand for their own use, and the right to re-enter for non-payment of the rent, or because there is no sufficient distress on the premises. TVho then had the right of improving the property when occasion required, or inducements were held out to its improvement, if the lessees or their assigns had not? They therefore had that right. The next link in the chain of Carrington’s title is,
2nd. The lease, dated the 10th day of February 1816, from the same lessors to the same lessees, demising the fishery aforesaid and its appurtenances for the term of sixty years for the yearly rent of $1,000, and extending the lease of the sandy bar (except as aforesaid) as to the full and free use of sand from the same as aforesaid, and none other, from the first day of April 1835, the termination of the former lease, for the term of 40 years, 10 months and 9 days (so as to make the extended lease of the sandy bar terminate on the same day with the term thereby granted in the fishery as aforesaid), for the yearly rent of $450. This lease contains a similar provision in regard to re-entry, and also in regard to surrender of the lease, as is contained in the said lease of the 16th day of March 1815, and authorizes a surrender of the lease so far as the same relates to the fishery, without surrendering the lease so far as relates to the use of sand from the same. It 'also provides that if the lessees or their assigns should he disposed to erect or put any additional buildings further and other than are mentioned and provided for in the said former lease, it shall be lawful for them to erect or put a house or houses on any part of the said sandy bar, or in any way to im *83 prove said premises. This provision seems to be regarded as an enlargement of the power of improvement given by the former lease; and it no doubt is so, to this extent, at least, that the former lease is only of the sandy bar, excluding the fishery, whereas this lease is of both; and as the former lease contemplated the making of such improvements as would be useful in the operation of getting sand, this lease contemplated also the making of such as would be useful in conducting the fishery. But perhaps the provision in each case ought to be construed with what immediately follows; and that is, a covenant on the part of Patrick Coutts, his heirs and assigns, to pay to the lessees or their assigns one-half of the value of such improvements, in case of a surrender of the property before the expiration of the term. In case of such a surrender, it was no doubt considered reasonable, that the tenants should be compensated for one-half of the permanent improvements made by them in the prosecution of the business for which the property was leased; while it might have been considered very unreasonable to compel the lessor, his heirs or assigns, to pay one-half of the value of any improvements which the lessees or their assigns might choose to put upon the property, though wholly unconnected with the purpose for which the property was leased. The limitation, if any, on the power of the lessees or their assigns to improve the property, was only intended, in that view, to limit the liability of the lessor or his assigns for one-half of the value of such improvements in case of a surrender as aforesaid. It could hardly have been intended, in either lease, to deny to the lessees or their assigns the right to make any improvements they might please on the property, at their own expense and without any recourse whatever against the lessor or his assigns for indemnity in whole or in part, whether the lease was terminated by a surrender *84 or by lapse of time, at least unless such improvements interfered with the fishery or the ferry.
3. A deed from Pleasant to James Winston, dated in 1816, assigning the former’s right under the aforeThe said lease of the 16th day of March 1815. ° and month of the execution of this deed are blank, but it ivas recorded on the 18th day of October 1816, and was probably executed after the lease of the 10th of February 1816, especially as that lease is to both James and Pleasant Winston, which it would hardly have -been if Pleasant had previously assigned his interest under the former lease to James. The assignment was no doubt intended to be of the right of Pleasant to the sandy bar under both leases, as we cannot suppose that he intended to part with his interest in an existing lease for 20 years, and retain his interest under a lease-of the same subject which is not to commence until the end of that term. At all events, it does not appear that he has ever claimed any interest in the subject since the execution of that assignment, and it •is not pretended that he has had any. His entire interest must therefore be considered as having been assigned to James Winston.
4. A deed of trust dated the 8th day of November-1819, from Patrick Coutts to Coleman and Otis for the -benefit of James Winston, conveying, besides other •property, “all the right', title, and interest, reversion or reversions, remainder or remainders, of the said Couttsin the property called the sandy bar and fishery, and otherwise described in the plan of the city by lot No. 341.” The deed recites, that Winston, at the request. ■ of Coutts, had endorsed for him three negotiable notes of specified amounts, "all dated the first of November, and payable at the Farmers Bank'of Virginia, two of them at nine months, and the other at twelve months, after date, and that Coutts was “ willing and desirous ' of securing the payment of the said notes by the con *85 veyance of property in trust for that purpose.” The deed then proceeds to convey the property; after which the trusts are declared to he, that if the said shall fail to pay either or all of the said notes when they are due, it may be lawful for the said trustees, or J 7 J 7 either of them, or the survivor of them, his ex’ors or adm’rs, to sell the whole of the property conveyed, “at the request of said Winston, his ex’or or adm’r, and convey the same to the purchasers, and out of the proceeds of such sale, shall pay and satisfy the notes aforesaid, together with all costs, interest and expenses attending the execution of the trust.” “And upon the further trust and confidence, that after full payment or satisfaction of the notes aforesaid shall have been made, any surplus of the proceeds of such sale or sales as aforesaid, which may remain in the hands of the trustees, or either of them, or the ex’or or adm’r of either, shall be applied to the payment of any debt and interest which may at the time be due from the said Coutts to the said Winston, and any surplus to be paid to the •said Coutts.”
There never was any sale made under this deed of trust. Default was made in the payment of all the negotiable notes secured by it. At the request of Winston, the endorser, Otis, the surviving trustee, advertised a sale to be made under the deed on the 6th day of December 1828, more than three years after the last of the said notes had become payable. . But the day before the sale was to have been made, to wit, the 5th of December, Coutts paid the whole amount of the said three notes with Edward C. Mayo’s check. And the holders of the notes, by John Forbes, their attorney, thereupon surrendered the notes and instruments of protest to said Coutts, and released all liens, trust deeds, &c., for their security. But there never was any release of the deed of trust by the trustees, or either of them, or the representatives of either, or by Winston.
*86 5. A surrender was made of the lease of the 10th of February 1816, so far as related to the fishery, in conformity with the provisions of that deed, and in pursuanee of a notice from “James Winston, assignee of Jas. & P. Winston,” to Patrick Coutts, executed on the latter June 21st, 1820, to take effect at the expira££on 0£ gjx months from that day. In consequence of that surrender, since 1820 James Winston and his assigns have not held the fishery nor been accountable for the rent thereof.
6. A deed of trust from J ames Winston to Charles J. Maemurdo and George Winston, dated on the 21st day of November 1820, conveying certain property therein mentioned, including “the interest of every kind, by lease, deed of trust or otherwise, which the said Winston has in the sandy bar property in the said city,” and all other property of said Winston, except a bond and note mentioned in the deed.
7. The decrees and other proceedings in the suit of “Pugh v. Winston,” brought by a judgment creditor of James Winston to impeach the said deed of trust of the 21st day of November 1820, to Maemurdo and Winston, as fraudulent and void in regard to the creditors of said James Winston. The said deed was accordingly adjudged to be fraudulent and void, and on the 16th day of November 1832, Samuel T. Pulliam was appointed commissioner to sell all the real estate conveyed by the deed, with the exception of a certain specified portion. The said commissioner, after making a sale under that decree, made a report, in which is contained the following statement: “The interest of James Winston in the sandy bar property, the commissioner did not offer for sale, doubting whether it was intended by the decree that he should do so. The interest spoken of he understands to be, a lease' on that property, which will expire some time in the year 1835. It is represented that Winston holds *87 the property under a lease from Coutts at an annual rent, and Mayo has acquired the title of Coutts. Mayo states, that Winston pays him no rent, on the ground that Coutts is indebted to him more than the amount of rent that will become due during the lease. If the court should direct a sale of the sandy bar property, the sale thereof would no doubt be promoted by giving to the purchaser of the leasehold estate the same right of setting off against the rent the debt due by Coutts to Winston, that Winston now has.” On the 1st day of July 1833, another decree was made in the suit, reciting substantially the above mentioned statement of the commissioner, and directing him to sell at public auction to the highest bidder, upon a credit of one year (after advertising the time, place and terms of sale as directed by the decree), “all the interest of every kind which the said Winston, at the date of the deed of trust before specified,” to wit, the deed to Maemurdo and Winston, “had in the sandy bar property in the city of Richmond, whether such interest be by lease, deed of trust or otherwise, together with a right on the part of the purchaser of setting off against the rent that will accrue after such purchase under the lease, so much of the debt due by Coutts to Winston as will be equal to the rent that may so .accrue.” The commissioner afterwards reported that on the 16th day of August 1833, he made a sale in strict pursuance of the directions of said decree, after advertising the time and place of sale as therein directed,when George M. Carrington being the highest bidder, became the purchaser at the price of nine thousand two hundred and forty-five dollars, who had executed his bond for that sum payable at the end of one year from the day of sale, with securities. The report contains this further statement: “This commissioner heretofore reported that he understood the interest of Winston in the sandy bar property to be by *88 lease which would expire in 1885. This is true; but there existed another lease, unknown to the eommissioner at that time, which will not expire until the end of 40 years from the expiration of the first. The existence of this last lease was known of at the sale above reported.” On the 23rd day of November 1833, the sale was confirmed by the court and a conveyance directed to be made to the purchaser. And accordingly, on tbh 18th day of August 1834, the purchase money having been paid, a deed was executed by said Samuel T. Pulliam, commissioner as aforesaid, conveying the property to George M. Carrington, describing it in manner aforesaid, that is, “all the interest of every kind which the defendant James Winston at the date of the deed of trust of the 21st day of November 1820 (from said James Winston to Charles J. Macmurdo and George Winston), had in the sandy bar property in the city of Richmond, whether such interest be by lease, deed of trust or otherwise, together with a right on the part of the said George M. Carrington, of setting off against the rent that will accrue after his purchase under the lease, so much of the debt due by Coutts to Winston as will be equal to the rent that may so accrue.” The said deed was duly recorded.
Under the foregoing chain of title, Carrington, his representatives and assigns, have ever since been in the possession, use and enjoyment of the property according to. the terms of the sale and conveyance to him as aforesaid, claiming to be entitled so to hold, and to continue so to hold it, until the expiration of the term of 60 years created by the said lease of the 10th day of February 1816, to wit, until the 10th day of February 1876. Is the claim well founded?
Several objections were made to the claim in the course of the argument, and especially by the counsel of Mayo’s representatives, which will now be noticed.
*89 The objection taken on account of the limited right supposed to be conferred by the leases, to wit, the mere right to get sand and make such improvements - as related thereto, has already been sufficiently an- e swered.
Another objection is, that the leases have been long < since forfeited by non-payment of rent, and indeed were so forfeited by James Winston long before the sale to Carrington. It is a sufficient answer to this objection to say that no such forfeiture has ever been enforced or attempted to be enforced, even if there had been any just ground for enforcing it. The deed expressly reserves a right of re-entry for non-payment of rent, and yet no such re-entry ever has been made or attempted to be made. In the lease to Mayo of the 12th day of Hovember 1823, leasing to him the ferry and other property, including the sandy bar, for ten years at an annual rent of one thousand dollars, it was stated that the lease of the sandy bar to the Winstons had been forfeited, but it was provided that if Mayo should use all due diligence to obtain possession of the said sandy bar and fail therein, or if having obtained possession, he should be evicted' therefrom, then and in either such case the said Mayo should be entitled to a deduction at the rate of $200 per annum from the said rent of $1000. Mayo, not having obtained such possession, received the benefit of the said deduction from his rent. His lease extended down to the time of Carrington’s purchase. If the forfeiture had been enforced during that period, it would have been for the benefit of Mayo, by the express terms of the lease to him. Hot only had Mayo a right during his term to enforce the forfeiture, if any, but a right to do so was also reserved to Scott, trustee of Reuben Coutts, who joined in the lease, though the exercise of said right by him was to enure to the benefit óf Mayo. Thus there was the strongest inducement at that time to *90 enforce the forfeiture, if any, and yet no attempt was made to enforce it. The presumption is irresistible that there was no such forfeiture. At all events there was no re-entry or statutory proceeding equivalent thereto, without which a forfeiture cannot be enforced. # ? It is therefore now quite too late, and was too late in 2340 when Mayo’s suit was brought, to say there was a forfeiture.
Another objection is, that the debts from Coutts to Winston was secured by the deed of trust to Coleman and Otis of the 8th of November 1819, only on condition that a sale was made under that deed to satisfy the three negotiable notes, called “the Micks debt,” for the security of which it was executed, and that those notes having been paid without making a sale under the deed, it therefore cannot operate as a security of the debt to Winston.
The Circuit court was of opinion that this deed of trust was an unconditional security as well of the Winston debt as of the “Micks debt,” while the counsel for Carrington’s representatives seemed to think that it became an absolute security of the Winston debt only from the time of default in the payment of the negotiable notes, or one of them, upon which default a sale could be made at the instance of Winston, according to the terms of the deed. Much may be said to sustain the view of the Circuit court. The deed is not a mere power of sale. Nor is it a mortgage with condition to be void on the punctual payment of the notes, in which case the estate, upon such punctual payment, would be, ipso facto, revested in the mortgagor. But it is a deed of trust for the benefit only of James Winston, who is one of the parties to the deed. He is the endorser of the three negotiable notes, the holders of which are not named, probably because the notes had not been negotiated at the date of the deed. It recites that the grantor is desirous of securing the payment of *91 those notes by the conveyance of property in trust for that purpose, and he therefore proceeds to make the convevance. The debt to Winston is not mentioned in the recital of the deed, nor until direction is given for the disposition of the proceeds of sale, when provision is made for the payment of the debt to Winston out of the surplus, after satisfying the negotiable notes. An estate in fee in the trust subject being conveyed by the deed to the trustees in trust for the benefit of Winston, a party to the deed, it may well be doubted whether a court of equity would compel or permit the trustees to release the property to the grantor without jiayment of the debt to Winston expressly provided for in the deed. The trustees hold the legal title for the benefit of Winston. It is in effect Ms legal title, and the maxim that he who asks equity must do equity, might require the payment of that debt as a condition for affording equitable relief to the grantor. But it is unnecessary to decide that question, as the effect in this case is precisely the same if the said deed became an absolute security of the debt to Winston only from the time of default in the payment of the negotiable notes or any of them. We think it became such a security at least from that time, if it was not before. All the notes became due within 12 months after the date of the deed, which was the 8th of November 1819, and all were protested for non-payment. In November 1820, and even before, Winston had a right to require the trustees to execute the trust by a sale of the subject and application of the proceeds according to the directions of the deed, which included the payment of the debt to him. His right to have this debt paid out of the trust subject could not be thereafter defeated by payment only of the Micks debt. There might have been some reason for affording the debtor an opportunity to defeat the deed as a security for the Winston debt, by punctual payment of the negotiable notes; but there *92 would have been none in reserving to Mm tbe right of doing so at any time after default in such payment and before an actual sale under tbe deed. It would have, been worth little or nothing as a security of that debt if it could have beeii thus defeated by tbe debtor at any time before an actual sale. A debtor in insolvent circumstances would be strongly tempted to defeat it, by a fraudulent combination with an unsecured creditor, or some other person. In this case, not only were tbe negotiable notes protested for non-payment, but tbe debtor remained in default for more than three years ; during 'all which time be was in insolvent circumstances, and be actually took tbe oath of insolvency. It was not until after tbe trustee in tbe deed, at tbe instance of Winston, tbe endorser of tbe notes, had advertised a sale of tbe trust subject, or part of it, and tbe very day before tbe sale was to have been made, that tbe notes were paid by tbe debtor; and then they were paid by some arrangement made by bim with Mayo. But tbe deed of trust was not released. There was executed, at tbe time of payment of tbe notes, a very full release of them, and of tbe lien of tbe deed of trust so far as it secured them, but executed only by tbe holders of tbe notes by their attorney. Ho release at all was executed by Winston, nor by tbe trustee in tbe deed. Why was not such a release executed, at least by tbe trustee, if tbe deed was then considered as satisfied? Ho such release has ever been executed, nor was ever required or claimed, so far as tbe record shows, until Mayo’s suit was instituted in 1846, 27 years after tbe date of tbe deed. We therefore think tbe deed continued to be a security of tbe, Winston debt after, and notwithstanding, tbe payment of tbe protested negotiable notes.
Another objection is, that Winston and bis assigns bad no right to set off so much of bis debt as was necessary against tbe annual rent of tbe sandy bar as it accrued, in payment and satisfaction of said rent.
*93 T3ie sandy bar, as ive have seen, was a part, and. only a part, but what proportion we do not know, of the trust subject created by the marriage settlement be-' tween Reuben and Jane Coutts, before referred to. At the time of the execution of the leases in 1815 and 1816 as aforesaid, it was bound for a proportional part, we know not how much, of the annuity of $500 secured to Jane Coutts for life by that settlement. Subject only to that charge, it belonged absolutely to Patrick Coutts, a son of Reuben and Jane. McCraw, the trustee, and Jane Coutts, the annuitant, joined Patrick Coutts in the execution of the leases, and the rent was made payable to the trustee, for the purpose, no doubt, of securing the payment of that portion of the annuity for what Patrick Coutts’s part of the trust subject was bound. In every other respect the rent belonged, as the property belonged, to Patrick Coutts, and at the death of Jane Coutts, which happened in 1831, the rent belonged, as the property belonged, absolutely to him free of any charge or trust whatever. During the existence of the trust the trustee might have required the rent to be paid to him in pursuance of the literal terms of the leases, for the pm-pose, but only for the purpose, aforesaid. That purpose being satisfied, the residue of the rent belonged to Patrick Coutts; and so much of Ms debt to Winston as was necessary to pay so much of the rent as thus belonged to Patrick Coutts might well have been set off against it as it accrued; and a court of equity would have enforced the right, especially as Patrick Coutts was insolvent. See Coutts v. Walker, 2 Leigh 268. After the death of Mrs. Coutts in 1831, which was several years before the sale to Carrington, when the whole rent belonged to Patrick Coutts or his assigns, there could be no doubt as to the right of set-off. But even before her death, and while the trust existed, the whole .rent, by the permission of Jane Coutts and her trus *94 tee, practically enured to the .benefit of Patrick Coutts, who received and applied it to his own use. There many transactions between Patrick and Jane Coutts, and we do not know how their accounts stood in the end. Scott who was appointed trustee in Mc- . . Craw’s place m 1823, and continued to act as such until 1829, proves that Mrs. Coutts’ annuity was paid during that period; and he bad in his own hands the means of such payment, for in November 1823 he leased the ferry and other portions of the trust subject to Mayo for ten years at a rent of $800 per annum, which he received while he was trustee. Winston then might well have retained the rent which accrued, even during the life of Jane Coutts, as to every body at least but herself to the extent of her rights, and as to her with her consent, on account and in part payment of his debt. He did so retain it after 1820, without any objection or complaint so far as the record shows, and the transaction being thus so long since settled, it was too late in 1846, when Mayo filed his bill, to make the objection for the first time. We therefore think this objection cannot be sustained.
Another objection is, that this supposed right of set-off or retainer of the annual rent on account of the debt to Winston, was incapable of being sold, and was improperly decreed to be sold in Pugh v. Winston; that neither the parties to these suits who are now claiming against Carrington, nor those under whom they claim, were parties to that, or bound by the decree therein made; and that therefore Carrington acquired no such right of set-off or retainer under the said decree, and the sale and conveyance made to him in pursuance thereof.
Py the deed of the 21st of November 1820, James Winston conveyed to Macmurdo and Winston the interest of every kind, by lease, deed of trust or otherwise, which he had in the sandy bar, “and all other *95 property of every kind and description whatsoever, belonging or appertaining to the said James Winston, with all the privileges, rents, profits and advantages every kind thereto belonging;” excepting only a certain bond and note not affecting the matter under ° . consideration. In Pugh v. Winston this deed was set aside as to the creditors of Winston, and all the property thereby conveyed was subjected to the payment of his debts. It became the duty of the court by its decrees in that ease, so to dispose of the trust subject as to realize the largest possible fund for the benefit of the creditors. All the rights of Winston in regard to the sandy bar, the debt of Coutts, and the right of set off and retainer aforesaid as they existed at the date of the said deed, constituted a part of the trust subject so to be disposed of. The commissioner appointed to sell the real estate reported that he did not offer for sale the interest of Winston in the sandy bar, doubting whether it was intended by the decree that he should do so; that Mayo stated that Winston paid him no rent, on the ground that Coutts was indebted to him more than the amount of rent that would become due during the lease; and that if the court should direct a .sale of the sandy bar property, the sale thereof would no doubt be promoted by giving to the purchaser the leasehold estate the same right of setting off against the rent, the debt due by Coutts to Winston that Winston then had. The court accordingly decreed a sale of “all the interest of every kind, which the said Winston at the date of the deed of trust before specified, had in the sandy bar property, whether such interest he by lease, deed of trust or otherwise, together with a right on the part of the purchaser setting off against the rent that will accrue after such purchase under the lease, so much of the debt due by Coutts to Winston as will be equal to the rent that may so accrue.” And in strict conformity with this *96 decree, a sale was made and a conveyance executed to Carrington, the purchaser at the sale, as has already been stated. That 'this part of the trust subject' was thus disposed of to the best xiossible advantage, there can be no doubt. The price at which it was sold . greatly exceeded what was expected by the commissioner and the counsel in the case. He was astonished at it, and supposed, from the great price at which the property was sold, that the competing bidders, Mayo and Carrington, knew more about the property than he did. He would not have thought the property sacrificed if it had brought only one-tenth of what it sold for. The court therefore did right in decreeing and confirming the sale in manner aforesaid. But even if the court had done wrong in that respect, Winston and his creditors, who were parties to the suit of Pugh v. Winston, alone could have complained of it, and they did not complain, but acquiesced in what was done, as well they might. Mayo, surely, has no right to complain, (supposing all the other objections we have been previously considering to have been rightly disposed of); for he had no interest in the question as to the manner of selling the trust subject. But besides, he impliedly acquiesced in the sale and gave it his sanction, by what he said to the commissioner before the sale, by his presence and conduct at it, and by his conduct afterwards. Once, twice or thrice prior to the sale, he requested the commissioner not to make it in his absence. He attended the sale, and was the highest bidder for the property next to Carrington — having bid within four dollars of the price of $9,245, at which it was sold to Carrington. He made no objection at or before the time of sale to the manner in which that sale was decreed to be made. Indeed, it would seem to have been at his suggestion .that the sale was made in that manner. At all events, his statement to the commissioner, referred to in the *97 latter’s report, was the occasion of so making the sale. He doubtless expected to become the purchaser at the sale, and to acquire a perfect title to the property in that way. But he was probably as much surprised as was the commissioner at the high price which was bid for it, and was thus deterred from becoming the purchaser. He set up no claim against the purchaser for rent or otherwise after the sale, until the institution of his suit in 1846, a period of thirteen years; and then it was quite too late to make the objection, even if it could ever have been made.
Then, Carrington became entitled by the sale and conveyance made to him, as aforesaid, to all the interest described in the conveyance, as has been before mentioned. The leasehold interest of Winston in the sandy bar, the debt due by Coutts to Winston secured by deed of trust on the former’s interest in the sandy bar, and the right of set off against the rent as it accrued, of so much of the said debt as was necessary for the payment of the said rent, as set forth in the conveyance, thereby became the interest and property of George M. Carrington. He had a right, at his election, to continue to hold the properly until the termination of the lease thereon, setting off so much of the said debt as was necessary for the payment of the rent as it accrued, or to enforce the execution of the deed of trust on the interest of Patrick Coutts in said property for the security of the said debt, provided the balance due thereon could be ascertained.
But can that balance now be ascertained; and if not, what then is the right of Carrington’s representatives ?
We think that balance cannot now be ascertained. There is no question in this cause about which there has been more controversy than this question, What was the amount of the debt due by Coutts to Winston, secured by the deed of the 8th of Hovember 1819 to *98 Coleman'and Otis and conveyed by tbe deed of the 21st of November 1820 to Macmurdo and "Winston ? matter might have been easily ascertained about ^me 0f £he 0f t}ie iast mentioned deed or in a reasonable time thereafter. Probably it might have been easily ascertained on, or in a reasonable time after, the 1st of December 1823, the date of the deed to Mayo. But no person took any step to have the account settled (although it was known to all concerned that the amount of the debt was unascertained, and that Winston claimed and was exercising the right of paying his rent as it accrued by setting off against it so much of the said debt as was sufficient for the purpose), until the 26th of October 1829, when Edward Henshaw, who had just been appointed trustee to execute the trusts of the marriage settlement of September 10, 1799, brought a suitin' the late Superior Court of Chancery holden in Bichmond, against "Winston and others, for an account of rents due by him for the sandy bar, &c. On the 25th of June 1830, a decree was made for the settlement of an account of said rents before a commissioner of the court. Accordingly, during the same year, commissioner Baker proceeded to settle the account, both parties appearing before him and furnishing materials for the settlement. In August 1835, he returned a report showing that on the 1st of December 1823, the date of the deed to Mayo, there was due by P. Coutts to "Winston, after crediting all the rents which had accrued previously to that day, a balance of $13,425 61, with interest on $11,804 69, part thereof, from that day until paid. There was an exception to the report by Samuel Taylor, Esq., counsel for the plaintiff, and a special statement was made by the commissioner in conformity with the views taken in the exceptions, according to which, the balance due was only $45 91. In June 1841 the death of the plaintiff was suggested. In August 1843, on -the *99 motion of the defendants a scire facias was awarded to revive the suit against the plaintiff’s representatives, and it was afterwards revived accordingly. In March 1845, Carrington presented a petition in the case and prayed to he made a defendant. In March 1846 the petix ^ x tion was allowed to be filed, and was filed accordingly, and itwas ordered thatunless the plaintiff should, within 60 days, amend his bill, and make Carrington a defendant, it should stand dismissed with costs. The time for amending the bill was afterwards enlarged on the motion of the plaintiff; but he still failing to make the amendment, on the 23d of February 1848 the order of dismission was made absolute. And thus ended in 1848, this effort, commenced in 1829, to ascertain the true state of accounts between "Winston and Coutts. The effort was no doubt abandoned, because while the precise balance due on account of the debt to Winston was not ascertained, it was yet ascertained to the satisfaction of the plaintiff and his able counsel that there was at least a sufficient balance due to absorb the rent which would accrue during the term. The attempt made to obtain a settlement in that suit was made under much more favorable circumstances than now exist for that purpose. The suit was brought just nine years after the date of the deed to Macmurdo and Winston, and just six years after the date of the deed to Mayo, when the transactions were comparatively recent, when Winston and Mayo were living, and when Winston and the trustee Henshaw, who was represented by able counsel, attended before a skillful commissioner and furnished materials for settling the account. It was during the pendency of that suit, and probably after the commissioner had stated the account, though before he returned his report, to wit, on the 15th of August 1833, that the sale was made in Pugh v. Winston, at which Carrington became the purchaser as aforesaid. It is probable that both Mayo *100 and Carrington, who were bidders at that sale, were then fully aware of the proceedings which had taken place in Henshaw v. Winston, and believed that the balance due on the debt of Coutts to Winston would be more than sufficient to absorb all the rent that would accrue on the lease during the term. Under these circumstances the sale was made, and Carrington outbidding Mayo became the purchaser. If Carrington was not satisfied to retain the rents which were to accrue during the term in satisfaction of the debt to Winston, but intended to endeavor to ascertain the balance due on that debt, and enforce the execution of the deed of trust to Coleman and Otis for its payment, it was his duty immediately after his purchase to make an effort to have a settlement. The effort even then would doubtless have been abortive. But if it would have been successful, he has lost the benefit of it by his laches in not having made it; and the most he or his representatives can now claim on account of the said debt, is the right to retain the rents in satisfaction thereof as aforesaid.
In July 1858, Jane New Coutts, only child and heir at law of Patrick Coutts, filed her answer in the ease of Mayo v. Carrington, and filed therewith as exhibit E, a paper stated to be in the handwriting of Edward Henshaw, and to have been found among papers which he in his lifetime had placed in the hands of his counsel, who had handed them over to the respondents’ counsel a few weeks before he prepared the said answer; and also stated to be a copy of an original in the handwriting of James Winston, and then in the possession of the plaintiff Mayo, who was required in the answer to produce the said original, and accordingly did produce it. This is the first appearance which that document, or any reference to it, makes in the record. It purports, and was afterwards proved to be, a proposition made by Winston, to Samuel McCraw, P *101 Coutts and Mrs. Jane Coutts in regard to the debt and the items thereof due by Coutts to "Winston at the time of making said proposition. If the debt stated in that proposition was all the debt due by Coutts to Winston secured by the said deed of trust to Coleman and Otis, then it was greatly less than what was ■claimed to be due by Winston, and shown to be due by Baker’s report in Henskaw’s suit as aforesaid. But the proposition is not dated, nor is there any date to any of the items therein contained. There was much contrariety of speculation in the argument as to the time when this proposition was made. Winston himself, who was twice examined as a witness, was unable to fix the time certainly, though he thought it was before the execution of a deed by him to Coutts, dated November 6, 1817. The Circuit court was of opinion by inference, from circumstances stated, that the said proposition was made about the middle of the year 1821, and that it ascertained the true amount of the principal of the debt secured by the said deed of trust. The court decreed a settlement of the account according to that view. To the report of the commissioner made under that decree, Carrington’s administrator excepted, and his counsel maintained the exception by a forcible argument tending to show that the said proposition did not embrace the entire debt secured by said deed, and he concluded his argument by insisting that “ the account settled by commissioner Baker in the suit of Henskaw v. Winston, which was commenced when the transactions were comparatively recent, and the evidence in the possession of the parties and not lost, as it now is, by the lapse of time, should be regarded and treated as the nearest approximation to justice between the parties now attainable.” Perhaps, if it were necessary or proper now to undertake to ascertain the balance due on account of the ■said debt, we would take the same view which was *102 taken by the Circuit court. But we think that under the circumstances a correct account cannot now be settled, and it is therefore not proper to attempt such a settlement. It seems, however, that if one were ma<^e aecording to the view of the Circuit court, it would not materially affect the result to which our vjews 0f the case will conduct us.
Then it only remains on this branch of the case to state the result to which our views conduct us in regard to the right of Carrington’s representatives in and to the sandy bar.
¥e think they are entitled to hold the property, with all the improvements thereon, for their own use until the expiration of the terms created by said leases, to wit, until the 10th day of February 1876, and no longer; they paying all the taxes assessed on the said property and its improvements during that period, and retaining the annual rent, after deducting therefrom such portion of the annual taxes as may be properly chargeable to the landlord or owner of the reversion, on account and in payment of the said debt of Coutts to Winston, the benefit of which was included in the sale and conveyance to Carrington, as aforesaid. But the said Carrington’s representatives can receive the benefit of only so much of the said debt as may be sufficient to pay and satisfy all the rents until the end of the term as aforesaid (the amount due upon said debt being in our opinion amply sufficient for the purpose), and cannot recover any balance which may possibly be due on account of said debt, it being now impossible to ascertain such balance. In regard to tlm taxes which have accrued, or may accrue upon the property, only a small portion of them, if any, would be properly chargeable to the owner of the reversion.. At the time of Carrington’s purchase, and for several years thereafter, the annual tax on the property was very trifling — only a few cents; but afterwards it *103 gradually increased, and became at length consideraf, . J ’ . „ .. . ° „ . ble, m consequence, chiefly it not entirely, oi improvements put upon the property by Carrington, the creased rent produced by which he and his assigns have been receiving, and for the tax on which improvements he and they would at any rate be chargeable, The small portion of the tax for which the owner of the reversion may be chargeable ought to be deducted from the annual rent before said rent is retained and applied as aforesaid. It is the right and duty of a tenant to pay the taxes on the demised premises, and he may deduct the amount from the rent when the landlord is chargeable with them. In this case Carrington purchased the property “with a right of setting off against the rent,” &c.; that is, against so much of the rent as he would otherwise have to pay to the landlord, being the amount of the rent after deducting the amount of the tax which might bo chargeable to the landlord. To the extent of that tax, it was itself a set-off, and he required no other except as to the balance of the rent.
Having considered and disposed of the claims of the representatives of George M. Carrington, and ascertained that they are entitled to hold the subject in controversy for their use until the 10th day of February 1876, we come next to enquire, to whom will it belong from and after that day — which brings us to the consideration of the claims of the three remaining conflicting claimants. We will have to consider them very much together, as the grounds on which they severally rest are closely connected with each other, and were attended, in some respects, with the same circumstances. These are,
Secondly. The claim of the representatives of Ed. ward C. Mayo. This claim is founded on a deed dated and duly recorded on the 1st of December 1823, from Patrick Coutts to said Mayo, conveying in fee simple *104 the sandy bar, described as lot No. 341 in the plan of said city; also the ferry called Coutts’s ferry, with the ferry lot on the south side of James river, known in the plan of the town of Manchester by the No. 312; also four other lots in said town known as numbers 306, 307, 308 and 309. The sandy bar was conveyed expressly, subject to the deed of trust of “the 8th day of November 1819, to Benjamin W. Coleman and Asa Otis, for the benefit of James Winston.” The deed contains a covenant of general warranty. The only consideration mentioned in the deed is, “ the sum of one dollar.” But Mayo claimed in his bill that the real consideration of the deed was the sum of $3,906 96, the amount of the three negotiable notes secured by the said deed of trust, which amount was paid by his checks on the 5th of December 1823. The acquittance was given to Coutts as if he had paid the money, but has ever since been held by Mayo, who actually paid it. Under this deed Mayo claimed to be entitled to the sandy bar, subject only to the rights which still existed, if any, under the leases aforesaid, and instituted the suit of “Mayo v. Carrington,” on the 15th day of August 1846, for the purpose of asserting and enforcing his claim. And his representatives would be entitled under the said deed to the said property from and after the said 10th day of February 1876, but for the conflicting claims of the representatives of Jane and Patrick Coutts respectively. We 'must now therefore proceed to state those claims, and enquire whether, and to what extent, they or' either of them are well founded, and will defeat or affect the claim Mayo.
Thirdly. The claim of the representative of jane Coutts. She claimed that the deed of the 1st of December 1823, from Patrick Coutts to Mayo, was executed in consideration of the sum of ten thousand dollars, payable by installments, according to a contract *105 in writing made between the parties about the time of the execution of said deed, the benefit of which contract was assigned to her by Patrick Coutts a few after it was made, to wit, on the 12th of December 1823. And she brought the suit, the present style of which is “ Coutts’ adm’r v. Mayo,” for the purpose of recovering her claim by enforcing the “ vendor’s lien” upon the property for the payment of the purchase money. The period of the institution of her said suit is not certainly known, as the papers in it have been lost; but it was probably some time in the year 1826. She exhibited with her bill the contract aforesaid, which is in the form of a proposition by Mayo to Patrick Coutts, accepted by the latter, and assigned by him to her, and is in the following words and figures:
“I will pay P. C., his ex’or, adm’r, or assigns, for his reversionary right in the sandy bar, ferry and ferry lot, and lots Dos. 306, 307, 308, and 309, the sum of §10,000, as follows, to wit, $500 on executing the deed, $500 in six months thereafter, and $1,000 per annum for 9 years thereafter.
m c. jf.”
Endorsed. — “I will take for the reversionary right the within sum of ten thousand dollars, as per statement within.

Pat Coutts.

Dec’r 6th, 1823.
Handed me by Samuel Carlisle.
I assign the within proposal to Jane Coutts, of E. C. M.
Pat Coutts.”
Dec’r 12th, 1823.
The representative of Jane Coutts claims that the whole amount of the said sum of ten thousand dollars, *106 with interest, yet remains due and unpaid. But before we say any thing more about this claim, we will state consider the only remaining one, which is,
Eourthly. The claim of the representatives of Patrick Coutts, who are his only child and heir at law, Jane New Coutts, and his widow Sophia Coutts, he having died intestate in 1829. They claim that the deed from P. Coutts to E. C. Mayo, of the 23d of December-1823, is fraudulent and void; that it was executed without any consideration, or for a consideration grossly inadequate, at a time when P. Coutts was greatly embarrassed, and known to be so by the said Mayo; that if the said Mayo did, as he pretended, pay the said sum of $3906 66 for the property, yet that was a price grossly inadequate, and so known to be by said Mayo at the time; and that the utmost which the said Mayo or his representatives can claim, under his' said deed, is to be reimbursed the money which he paid, with interest, after accounting for any rent due by him on his lease of the 12th of November 1823 aforesaid. This claim was asserted, for the first time, in the answer of Jane New Coutts, sworn to on 24th March 1851, (she not having, as she says, attained the age of' 21 years until December 1850,) but not filed until July 2d, 1853, in the suit of “Mayo v. Carrington.” It was also asserted in a bill filed by her in March 1854, which was the commencement of the suit, the present style of which is “ Coutts v. Mayo,” as aforesaid.
While we think that the views of the learned counsel who argued before us in support of this claim were very strongly presented, we are yet of opinion that according to the authorities, it cannot be said that the deed of the 1st of December 1823 aforesaid, is void for inadequacy of consideration; and that, whether the consideration was as represented by Mayo, or as claimed by the representative of Jane Coutts as aforesaid. There is no evidence whatever of any actual *107 fraud in obtaining the deed. There was no confidential relation existing between the parties. Coutts was not under the power of Mayo. They dealt at length, so far as the record shows. True, Coutts was in very embarrassed circumstances, and had taken the J . oath of insolvency. But that circumstance, even m connection with mere inadequacy of price, has never been held sufficient to avoid a deed. Inadequacy of price, to have that effect by itself, must be so great as to shock the moral sense. ‘ It is upon the ground of fraud — actual fraud — that the deed is avoided in such cases; and the evidence must be sufficient to prove the fraud. Inadequacy of price is always a badge of fraud. But to be in itself sufficient evidence of fraud, it must of necessity be very great. In this case it was said the sale was of a reversionary or expectant interest, and that in such eases the purchaser must make good the bargain, by proving that the consideration was adequate. And the later English authorities on this subject are relied on. But the case of Cribbins v. Markwood, 13 Gratt. 495, has settled the law on this subject in this State. It was there held that the English doctrine in relation to the sale of expectant interests, so far as it relates to vested interests, is not law in this State. Here the sale was not of a mere expectancy, but of a vested, though a reversionary interest. The authorities on this subject, English and American, are collected in 1 Leading Cases in Equity 428, and seq. marg., being the leading ease of Chesterfield v. Jansen, and the cases collected in the notes. It would be difficult at this late day to ascertain what would have been an adequate price for the property conveyed by the deed at the time of its date. But it cannot be said that the price given, or agreed to be given, was so grossly inadequate as to be in itself sufficient evidence of fraud to make the deed void. There is greater force, however, in the argument of the *108 counsel for Jane Mew Coutts, that if the payment of the sum of $3,906 96' in discharge of the “Micks’ debt,” was the only consideration for the execution of the deed as alleged by Mayo in his bill, then the said ^ee<^ must have been intended, and ought only to operate, as a security for the repayment of that sum. Indeed it would be difficult, if not impossible, for Mayo’s representatives, under all the circumstances of the case, to escape that result, if it should be held that he did not contract to purchase the property on the terms mentioned in the proposition aforesaid. With these remarks, the claim of the representatives of Patrick Coutts may be dismissed from further consideration, and we will now recur to the claim of the representative of Jane Coutts, who is the only remaining competitor with the representatives of Mayo.
To the claim of the representative of Jane Coutts several objections were taken in argument by the counsel of the representatives of Mayo, which we will now proceed to notice.
1st. It is objected that the subject of controversy in her suit is different from the subject of controversy in Mayo v. Carrington: the two suits have no just connection, and they ought not to have been heard together.
The suits were not consolidated, but only heard together. The object of Mayo’s suit was to have his right to the sandy bar, under the said deed of the 1st ■of December 1823, and the state of facts set out in his bill, declared and established; to have the deed from Patrick Coutts to Bouldin and Boper for the benefit of Jane Coutts, dated on the 28th of February 1821, and conveying the sandy bar and other property, set aside on the ground of fraud; to obtain a conveyance of the title to sandy bar from Otis, surviving trustee in the deed from Patrick Coutts to Coleman and Otis of the 8th of November 1819; and other specific relief, and *109 for general relief. The object of Jane Coutts’ suit ° ,, . .. was, to set up the contract aforesaid between Jratrick Coutts and Mayo for the sale and purchase of the sandy bar; to assert her claim for the purchase money as assignee of the said Patrick Coutts; and to estab- & lish and enforce the vendors’ lien upon the said property or the interest of Mayo therein, under the said deed of the 1st of December 1823, for the payment of the said purchase money and interest. "We think the subjects of controversy in the two suits were connected, and that they were properly heard together.
2dly. It is objected that all the papers in her suit have been destroyed, most of them long since; and that when the decree appealed from was pronounced, there was no record upon which a decree could be made in that suit, or upon the subject of controversy therein.
It seems singularly to have happened, that the papers in that suit have twice been lost or destroyed, so that when the said decree was pronounced, there was not a single paper in the record of the three suits which belonged particularly to Jane Coutts’s suit. There is in the record an official copy of only one of the papers which so belonged to that suit; though that paper was certainly a very important one, being the original contract under which she claimed, and which has already been set out in this opinion. ¥e were at first inclined to think that the difficulty of making a decree upon the subject of controversy in that suit, arising from the destruction of papers, was insuperable; but on further consideration we think otherwise. The original bill in Jane Coutts’ suit seems to have been filed about the 6th of October 1826, that being the date of an item in Robert G. Scott’s account as trustee for Jane Coutts charging a fee in that suit. She died in 1831. She had several successive adm’rs, and in 1857, the papers in her suit having been lost, Allen, her adm’r de bonis■ *110 non, pursuant to the statute in such case provided, filed a:a amended and supplemental hill to have the benefit of said suit, and asking that the same might be procee^e<i in to a final decree against the ex’or and heirs at law, or devisees, of Mayo; and filed with the said bill an affidavit of the loss of said original papers. ghortiy thereafter, and in the same year, Allen, adm’r as aforesaid, filed a further answer in the suit of Mayo v. Carrington, referring to the fact of his having filed the said bill, exhibiting a copy thereof as part of the answer (though no such copy is now in the record), and setting up the same claim which was asserted in the said bill as matter of defence in the said answer, and praying that the two suits might be heard together. On the 16th of July 1858, the said two suits, and the suit of Jane blew Coutts, were accordingly heard together, and a decree was made therein. The decree recites that the suit of Jane Coutts’s adm’r came “on to be heard on the statement of proceedings filed with the supplemental and amended bill of Joseph Allen, adm’r as aforesaid, and the said bill of the said Allen, the answer of the defendant James Winston to the original bill in the said cause, and the answer of” the executor, and legatees, and devisees, of said Mayo, to the said supplemental and amended bill, replications to said answers, upon the bill taken for confessed as to the other defendants, “ and upon the depositions and exhibits filed;” and among other things it was decreed, ■“that it be referred to a commissioner of the court to enquire, what were the true terms of the purchase by the said Edward C. Mayo from Patrick Coutts of the property conveyed by the said Coutts to the said Mayo by his deed of the 1st of December 1823, and when and in what manner the said Mayo has complied with the terms of his said purchase.”
Commissioner Cary executed this order of reference upon notice to all' the parties, and in the presence of *111 "their counsel, who argued the case before him; and . . _ _ upon full consideration he was of opinion, and accordingly reported to the court, “ that the true terms of the purchase aforesaid were that Mayo was to pay Coutts the sum of §10,000; §500 in cash, §500 in six months, and the balance in installments of §1,000 per annum for nine years thereafter, and that Mayo, in part compliance with the terms of sale, advanced or paid the sum of §3,906 96 as of the 5th of December 1823, for which he should be credited.” To this report both parties, that is, the representative of Jane Coutts and the representatives of E. C. Mayo, by counsel excepted, setting out fully the grounds of exception. On the 18th of February 1860, the three suits were again heard together, and another decree was made therein. This decree recites that the causes came on to be again heard upon the papers formerly read, upon the report of commissioner Cary and the exceptions thereto, “and also upon such of the original papers of the suit instituted by Jane Coutts in her lifetime against the administrator of Patrick Coutts, E. C. Mayo and others, as have been found since the former hearing.” And the report and exceptions were recommitted to the commissioner, who was directed to re-examine the said report in reference to the matters excepted to, and •especially in reference to the enquiry aforesaid as to what were the true terms of the purchase by said E. C. Mayo from Patrick Coutts. On the 26th of Eovember 1861, commissioner Evans was substituted for commissioner Cary to execute the last mentioned decree. Commissioner Evans promptly commenced that duty, but soon had to suspend it, in consequence of the disturbed condition of the country, until the end of the war, when he resumed and completed it, and returned his report, dated September 2, 1867. In his report he says: “Eo additional evidence in regard to the terms of the purchase by Mayo from Pat. Coutts, or in *112 regard to the manner the said Mayo complied with the terms of said purchase, has been produced before me; and while the conclusion to which I have come is not entirely satisfactory to my own mind, after a most thorough examination of all the papers in those causes, . ° . A . 7 including the various reports or commissioners, the exceptions thereto and the arguments of counsel upon said exceptions, the best opinion to which I have arrived is, that the true terms of the purchase by the said E. C. Mayo from P. Coutts of the property conveyed by said Coutts .to said Mayo by the deed of December 1, 1823, were that Mayo was to pay Coutts $10,000,” &e. as stated in the report of commissioner Cary. And he also agreed with that commissioner in opinion, that Mayo should be credited on account of said purchase money with $3,906 96 as of the 5th of December 1823. To this report exceptions were filed by the parties by counsel, which state and argue fully their respective grounds of objection to the report. On the 26th of February 1868, the three suits were again heard together, and the decree was pronounced from which this appeal was taken. This decree recites that the causes came on to be further heard together, “ upon such of the papers formerly read as have been preserved from the destruction of the fire of the 3d of April 1865, and upon the report of commissioner” Evans, and the exceptions thereto, and documents returned therewith. The court was of opinion that the true consideration for the conveyance from Patrick Coutts to Edward C. Mayo of the 1st of December 1823, was the sum of $10,000, payable as aforesaid; and that the sum of $3,906 96 shown to have been paid by the said Mayo, on the 5th of December 1823, ought to have been regarded as having been paid by him in part discharge of the said sum of $10,000; and that the residue of the said purchase money, with interest, after applying the said credit, is due to the *113 personal representative of Jane Coutts by virtue of the assignment from Patrick Coutts to her which was filed as an exhibit in the suit instituted by her for recovery thereof. And accordingly, the commissioner was directed to state an account showing what amount ° of purchase money and interest was due according to the principles aforesaid. •
The foregoing is a statement of the material proceedings which have occurred in the case on this subject since the filing of the supplemental and amended bill by the personal representative of Jane Coutts as aforesaid; and it is made thus full as being the best means of showing whether there was a sufficient foundation in the record for pronouncing a decree on the subject of controversy in that suit when the decree appealed from was rendered.
The only difficulty in the question arises from the fact, that not only were the original papers in the suit lost as aforesaid, but all the papers which were before the court when the decree of the 16th of July 1858 was rendered, and such of the original papers of the suit as were afterwards found and were also before the court when the decree of the 18th of February 1860 was rendered, have since also been lost or destroyed, but when or how, does not appear, unless they were destroyed “by the fire of the 3d of April 1865,” referred to in the decree of the 26th of February 1868. At all events, none of them were before the court when that decree was rendered, which recites, as before stated, that the said three causes then came on to be heard upon such of the papers formerly read as had been preserved from the destruction of the said fire.
There can be little doubt but that there were sufficient pleadings and proofs in the said suit before the court when the decree of the 16th of July 1858 was • rendered, to warrant the court in making that decree. *114 An enquiry was then directed to be made by a commissioner of the court, who accordingly made the enquiry in the presence and upon the argument of the counsel of the parties, and returned to the court a full report, to which all the parties excepted, setting out fully all the objections they then had to the report. This report and these exceptions, together with all the pleadings and proofs aforesaid, were before the court when the decree of the 18th of February 1860 was rendered, and also some of the original papers of the suit, which had been found since the former hearipg. And they certainly warranted the court in making that decree; whereby the said report, with the exceptions, was recommitted to the commissioner, with directions to re-examine the report in reference to the matters excepted to, and especially in reference to the enquiry aforesaid. Commissioner Evans, who executed the last mentioned decree, and who on the 26th of November 1861 was substituted for that purpose to the place of commissioner Cary, who had executed the former decree; promptly proceeded in the same year, to wit, on the 14th of December 1861, to the performance of his duties, when all the papers in the three causes were laid before him, and the parties attended by counsel. The said counsel also attended several other days, till the disturbed condition of the country suspended further proceedings till the end of the war, when he resumed his duties and made his report as aforesaid, “ after a most thorough examination of all the papers in these causes, including the various reports of commissioners, the exceptions thereto, and the arguments of counsel upon said exceptions.” It is probable that none of the papers which were before the court when the decrees of the 16th of July 1858, and the 18th of February 1860, were rendered, had been lost when commissioner Evans commenced the performance of his duties, but that all were before him *115 and were fully examined by him. He says in Ms report that “all the papers” were before him and were thoroughly examined by him, and does not speak the loss of any paper, much less of any inconvenience or difficulty which he felt in consequence of such loss.
The loss had occurred when the decree of the 26th of February 1868, being the decree appealed from, was rendered. But there were then before the court, the decrees of the 16th of July 1858, and the 18th of February 1860, made before the said loss and with all the papers before the court; also the reports of commissioner Gary and commissioner Evans, who thoroughly examined all the papers; also the exceptions of the parties by counsel to these reports; all these proceedings thus before the court when the decree appealed from was rendered, were parts of the record of the suit of Jane Coutts’s representative, and were the most material, if not the only matei’ial parts of that record. If not a paper had been lost, it is not probable that any other part of the record would have been used or referred to on the last hearing of the causes except what was actually before the court. At least it is not probable that there would have been any necessity for such use or reference. All that was material was no doubt embodied in the decrees, reports and exceptions aforesaid. "We are therefore of opinion, that notwithstanding the loss of papers as aforesaid, there was enough left in the record of the suit of Coutts’s adm’r v. Mayo, when the decree appealed from was rendered, to enable the court then to make a decree upon the subject of controversy therein. But if there was,
8dly. It is objected that there was no such contract between Mayo and Patrick Coutts as is contended for in the suit of Coutts’s adm’r v. Mayo.
The sandy bar with other property was, as we have seen, conveyed by P. Coutts to E.- C. Mayo, by deed *116 dated and recorded December 1, 1823, for the nominal consideration of one dollar. Mayo claimed in his bill, filed in 1846, that the true and only consideration was the sum of $3,906 96, paid by his check on the 5th of December 1823 in discharge of the “Micks’ debts” due by P. Coutts and secured by the deed of trust to Coleman and Otis. On the "other hand Jane Coutts claimed in her bill, filed probably in 1826, that the true consideration was the sum of $10,000 payable by installments as mentioned in a written proposition made by E. C. Mayo to P. Coutts and accepted by the latter, to whom it was handed on the 6th of December 1823 by Samuel Carlisle, a witness to. the deed from Coutts to Mayo, and assigned on the 12th of December 1823 by the said Patrick to the said Jane Coutts. These are the conflicting pretensions of these two claimants, and the question is, "Which of them is well founded ?
It is a well ascertained fact in the cause that the'said proposition was made by E. C. Mayo to P. Coutts and was accepted by the latter on or about the 1st of December 1823. Mayo admitted in his answer to a bill filed by Diddep, a creditor of Coutts, that the initial •signature, E. C. M., to the proposition, was his signature; though he further stated in the said answer that he had no recollection of srich a proposal, and denied that he made it as the consideration of the deed. He also asserted that no acceptance of it was ever signified to him so as to make it obligatory. This admission, at least establishes, beyond all cavil, the fact, that he made the proposition. And we are not obliged, in order to give it that effect, to concede the truth of the statements made by Mayo as aforesaid in connection with that admission. The whole answer is evidence to be .sure, but not conclusive, and we may believe one part and disbelieve another. We cannot but believe him when he says, in effect, that he made the proposition; in other words that the signature thereto is his.
*117 This is an all-important fact, if it be not in itself . . conclusive of the present enquiry. It is incredible that P. Coutts would have sold the property for $3906 96 to be paid to a creditor in discharge of an incumbrance upon it, when at the same time the vendee offered to pay him $10,000 for the same property! The conclusion therefore, is irresistible, that the sum of $10,000 and not the sum of $3906 96, was the true consideration of the said conveyance. The only plausible alternative to this conclusion seems to be that the conveyance was intended to operate only as a security for the repayment of the said sum of $3906 96, with interest thereon.
"What inducement had P. Coutts to sell the property in consideration only of the payment of one of the incumbrances upon it? "What was he to gain by that operation? lie was utterly insolvent, and had the year before taken the oath of insolvency. His property was incumbered by deeds of trust and judgments far beyond its value. He was in want of money, and was willing to resort to almost any shift to get it. "We can see the strongest motive for his selling his interest for $10,000, to be paid to his mother, who had a deed of trust on the property, while we can see none whatever in his selling his interest in consideration of the payment of one of the incumbrances. It is said that the deed of trust to Coleman and Otis, under which the sandy bar was advertised for sale, included other property, viz: a vessel and four slaves, and that P. Coutts wished to retain possession of this latter property. But there is no evidence, and it is extremely improbable, that any of that property remained in his possession at that time — four years after the date of the deed. His necessities and the pressure of his creditors had doubtless long before deprived him of it. If it had remained in his possession it would doubtless have been advertised for sale under the deed of trust instead of *118 the uncertain, and at that time unsaleable interest in the sandy bar. The slaves, at least, would have been ■ much more saleable.
There are, certainly, apparent difficulties in'the way of this conclusion which cannot be well explained at this remote period from the date of the transactions; and conflicting theories have been conjectured on the subject. ' Why was not the consideration expressed in the deed if it was $10,000, is one of the questions that have been asked. Because it was not desired to make public the amount for which the interest was sold, is a plausible answer. P. Coutts was heavily involved in debt, and his creditors were on the alert. After Jane Coutts- filed her bill in 1826 to enforce the execution of the contract, Diddep, a judgment creditor of Patrick Coutts, filed his bill, in which he sought to recover his judgment out of the purchase money. But the same question may be put in reference to the sum of $3906 96 if that were the true consideration. Why was not that consideration expressed in the deed? There could have been no reason for suppressing that as being paid to creditors secured by deed of trust; the publication of the fact of payment could give him no trouble. Why was the contract left to stand upon the mere proposition and acceptance if it was a concluded contract, is another question that has been asked. Why were not notes or bonds executed for the different installments of the purchase money? Why was not the cash payment, which was to have been made on the execution of the deed, in fact made? These are plausible questions, but they present no real difficulty. P. Coutts was not a man of business, and conducted his affairs very loosely. He seems to have regarded the written proposition of Mayo. accepted by himself and handed to him by Carlisle, a subscribing witness to the deed, as binding an obligation on Mayo as he could possibly have; and he therefore, in a few days,. *119 assigned it to his mother, who had a deed of trust on ° the property, then no doubt supposing that the matter was all arranged, and that nothing remained to be done but to receive the money as it fell due. The proposition, it will be observed, is very formal and specific, and must have been drawn by a master hand. Though it deals in contractions and initials, it yet contains all the terms of a perfect contract. The acceptance, too, is very formally drawn, and could hardly have been drawn by P. Coutts. Mayo was a man of business, and one would suppose must have known that it would have been more regular and business like to have executed bonds or notes for the purchase money. But he had no special interest in that matter, having a recorded deed for the property. That the cash payment of the purchase money was not made, may be accounted for by the fact that the deed to Bouldin and Roper was an incumbrance on the property, which was also otherwise incumbered, and Mayo did not wish to make a payment without being secured. He was extremely anxious to get the title and have control of the property, especially the ferry, but not so anxious to run any risk in the payment of the purchase money. If the sum of $8906 96 paid by him was a part payment of the purchase money, then the cash payment was in fact made, and several of the other installments were paid in advance.
It is said that Mayo had no notice of the acceptance of his proposition by P. Coutts, and that without such notice there could have been no contract between them. The legal proposition is true, but is the fact true on which it is founded? "We think not. Can it be possible that Mayo was not informed of the acceptance of his proposition, either by P. Coutts, or by Car-lisle, who handed it to P. Coutts? "Would Mayo have been content to remain in ignorance upon so important a question? He sent the proposition to P. Coutts, *120 it was never returned to liim; he received the full benefit of the contract, and neither P. Coutts nor his mother, to whom he assigned it, has ever set up any claim to purchase money under any other contract. ^ere;fore> ^ie contract was not perfected merely because Mayo was not informed of the acceptance of his proposition, it would follow that he made no purchase, and that his deed can operate only as a security of the money paid by him in discharge of the three notes aforesaid, with interest.
¥e therefore think there was a valid contract between the parties, such as the proposition and acceptance aforesaid import. But if there was,
4thly. It is objected, that there is no proof in the record of the assignment of the contract by Patrick to Jane Coutts. "We think there is sufficient proof of such assignment in the deposition of B>. Gf. Scott; and at all events, it has never been denied by P. Coutts or his representative, who has been a party to all the suits in which the subject has been involved. But supposing the assignment to be proved,
5thly. It is objected, that such assignment was a discharge of the equitable lien of the vendor for the purchase money, which, therefore, cannot be set up by the assignee. Upon the question, whether the vendor’s implied equitable lien for purchase money would pass by an assignment of the debt, the authorities are conflicting. Some of the cases decide that an assignment of the debt, even without recourse, carries with it this lien, like any other lien; but the majority of the cases, if not the weight of authority, "seems to be decidedly the other way; at least unless it appears that the assignor intended to assign the lien as well as the debt; in which case it seems that both would pass to the assignee, even though the assignment were without recourse to the assignor. When, however, the assignment is not without recourse, the weight of *121 authority is that the lien continues in full force not-J , _ « _ _ withstanding the assignment, and passes thereby to the assignee. Without citing the numerous cases on subject, it is sufficient to refer to the case of Mackreih v. Symmons, 1 Leading Cases in Equity 235 marg., and the notes of the English and American editors, where all the cases down to a very late period are collected. In this case the assignment was not without recourse, and there can be no doubt but that the assignor intended to pass to the assignee all the lien which he had for the security of the debt. We therefore think that the assignment in this case" did not discharge the equitable lien of the vendor, and that the same may be set up by the assignee, if indeed there be any occasion for setting it up. At the time of the sale to Mayo, the property was incumbered by a deed of trust from P. Coutts to Bouldin and Roper for the benefit of Jane Coutts and Samuel McCraw, dated on the 28th of February 1821, and duly recorded. The first object of this deed was, to secure the payment of a large debt specially mentioned, for which Jane Coutts had become bound for P. Coutts. The next object was to secure the payment of all sums of money for which she might ultimately become liable in consequence of any engagement theretofore made by her as security of P. Coutts, by becoming his bail or otherwise. And after providing fully for her indemnity, the deed next provides for the payment of any balance which might be found due to McCraw on his account as trustee in the marriage settlement aforesaid. McCraw was dead at the time of the sale to Mayo, and it does not appear that he or his representatives ever set up any claim under the deed. It was then an incumbrance exclusively or nearly so, for the benefit of J. Coutts, and must have been so regarded by Mayo, who no doubt had actual notice of it. It is not to be presumed that he would have made so heavy a purchase, of a man so much *122 embarrassed, without referring to the records to see what liens were upon liis property. He does not prein his bill, filed in 1846, that he had not such notice, although he impeaches that deed as having been executed to defraud creditors, and therefore void: and although he expressly denies notice of the fact that P. Coutts had taken the oath of insolvency in 1822. There can be- no doubt but that Mayo did not intend to pay the purchase money which he proposed to pay as aforesaid, without being protected against that deed. It is probable, therefore, that it ivas well understood between him and P. Coutts, that the contract for the purchase money should be assigned to Jane Coutts, and that the assignment which was actually made to her on the 12th of December 1823, just six days after the proposition was handed by Carlisle to P. Coutts, was made with the knowledge of Mayo. In this view of the case, Jane Coutts was in effect the vendor to Mayo, and at all events was entitled to the vendor’s lien for the purchase money, if indeed she had not a still higher and firmer lien by virtue of the deed of trust to Bouldin and Boper. There is no evidence before the court to impeach that deed, and if there were, Mayo cannot thereby be released from his obligation to pay the purchase money according to his contract. The deed to him has never been set aside or avoided in whole or in part at the suit of any creditor of P. Coutts; nor has he ever been compelled to pay to any such creditor one cent of the purchase money. But supposing that the vendor’s lien was not discharged by the assignment.
6thly. It is objected, that such a lien, or indeed any equitable lien or claim, cannot be set up and enforced by a voluntary assignee, and that Jane Coutts is such an assignee. In the first place we think that in this case she cannot be regarded as a voluntary assignee. She had many pecuniary transactions with P. Coutts *123 and became bound as bis security in manv cases. Sbe ** * had a deed of trust on his property for her indemnity. In this state of things the property or a portion it included in her deed is sold to Mayo, and the contract for the purchase money assigned to her, no doubt with the knowledge of Mayo, and for the purpose of obtaining her assent to the sale.
But suppose the assignment to have been voluntary, is it true that she cannot enforce the vendólas lien, or any equitable claim on that account? We think it is not. An executory or imperfect gift will not be enforced either at law or in equity unless a trust be created, which a court of equity will always enforce, though that court will never aid in creating a voluntary trust. But if the gift be perfect and executed, the title passes from the donor to the donee, whether the property be legal or equitable, in possession or in action. This subject was fully considered by this court in Henry v. Graves, 16 Gratt. 244, where many authorities are referred to, and especially the more recent cases. After reviewing them the court arrived at the following conclusion: “It maybe stated as the result of all the authorities; that a voluntary gift valid in law or equity may be made of any property, real or personal, legal or equitable, in possession, reversion or remainder, vested or contingent, and including choses in action, unless they be of such a nature as that an assignment of them would be a violation of the law against maintenance and champerty; that such a gift to be valid must be complete, and not executory; that what is necessary to the completion of a gift, depends on the nature of the subject and the circumstances of the case; and that it is always sufficient, though not always necessary, to the completion of a gift, at least between the parties, that the donor do everything in his power, or which the nature of the case will admit of to make it complete.” Id. 254. The case of Meek v. Kettlewell, 1 Hare’s R. 464, *124 23 Eng. Ch. R., decided, by Vice Chancellor Wigran, m 1842, affirmed by the Lord Chancellor, and relied by the learned counsel for the appellants in this cases is fully stated in the opinion of this court in also are the subsequent as Henry v. Graves, supra; cases of Kehewich v. Manning, 12 Eng. L. & Eq. R. 120, decided in 1852, and Voyles v. Hughes, 23 Id. 271, decided in 1853-4; in which subsequent cases that of Meek v. Kettlewell is very much shaken if not overruled, and is left to stand, if at all, only on the ground that in that case the interest conveyed was a mere expectancy. The language of Knight Bruce, Lord Justice, in Kehewich v. Manning, is very strong. In a very recent case, Richardson v. Richardson, 3 Law Rep. Eq. Cases 686, decided by Wood, V. C. in 1867, the doctrine of the ease of Kehewich v. Manning was followed and fully approved. The good sense of that decision, says the Y. C., “lies in this, that the real distinction should be made between an agreement to do something when called upon, something distinctly expressed to be future in the instrument, and an instrument which affects to pass everything independently of the legal estate. It was held in Kehewich v. Manning that such an instrument operates as an out and out assignment, disposing of the whole of the assignor’s equitable interest, and that such a declaration of trust is as good a form as any that can be devised. The expression used by the Lords Justices is this: A declaration of trust is not confined to any express form of words, but may be indicated by the character of the instrument.” According to these authorities it seems perfectly clear that even if Jane Coutts was a purely voluntary assignee of the contract between Mayo and P. Coutts, she had a right to bring a suit in equity thereon in her own name. The assignment to her was perfect, nothing remained to be done by P. Coutts to give it validity, and her suit was not against him but against Mayo the debtor. But,
*125 7thly. It is objected, that her claim is barred by laches, lapse of time and the statute of limitations. It is not barred by the statute of limitations. It that the suit was brought in 1826, though it was said in the argument that it was brought in 1829: but there 6 ° appears to be nothing m the record to support that statement. In either case, it was brought before all the installments had become payable, and in the former case it was brought within five years after the first installment had become payable. If the sum of $8,906 96 cts. paid by Mayo in discharge of the three negotiable notes aforesaid be a proper credit on account of the purchase money, then several of the earlier installments were paid in advance, and little or nothing was due when the suit was brought. So that, regarding the suit as analogous to an action at law for the money, the statute would not be a bar to any part of the claim. But the suit cannot be so regai’ded. It is a suit for the specific execution of a contract, or to enforce an equitable lien, and the statute does not apply to it. Then is it barred by laches and lapse of time? It was brought in due time — indeed, very promptly. But it is objected that there has been great laches in its prosecution, and that equity requires diligence, not only in bringing, but in prosecuting suits. This is certainly true, as a general rule, and there is no more favored rule of a court of chancery than that which exacts diligence of its suitors. But there are many extenuating circumstances in this case in regard to this suitor. She had a suit of great difficulty to prosecute, and had to encounter not only the strenuous resistance of her alleged debtor, but the conflicting claims of judgment creditors of Patrick Coutts; at least one of whom, Diddep, brought a suit in chancery to set aside the deed of trust to Bouldin and Boper for her benefit, or to recover the amount of his judgment out of the purchase money due to her by Mayo, upon the ground *126 that the said deed was fraudulent and void as to creditors. She died in 1831, a few years only after her suit was brought. She has been represented by several successive administrators, but it does not appear what steps were taken by them to carry on the suit. The unaccountable loss of papers, which has twice bappened in the suit, has left us no trace of its prosecution from the period of her death until 1857, when an amended and supplemental bill was filed in the case by Joseph Allen her adm’r cle bonis non with the will annexed. ITer prior adm’rs in succession may, for aught we know, have prosecuted the suit with reason-, able diligence, under the circumstances, though it would seem from the great lapse of time that they probably did not. Mayo was the principal defendant to that suit, and no doubt answered the bill. Diddep’s suit involved the same controversy, and Mayo answered the bill in that suit. Possibly it was considered sufficient to prosecute one only of these suits, and let the other await the result. And as Diddep claimed both against Mayo and Jane Ooutts, it may have been thought best to fight the battle in that suit. We do not know what has become of Diddep’s suit, which seems to have disappeared from the docket. Mrs. Ooutts’ suit still, remains, notwithstanding the accidents which have occurred by death and loss of papers as aforesaid. Mayo might at any time have had a rule to Speed in that case, if he desired to speed it, but it does not appear that he ever obtained such a rule. At all events he never had the case dismissed, although he long survived Jane Ooutts, and did not die until a recent period. In his bill, filed in 1846, he strangely ignores her suit, while he assaults, tolis viribus, the deed of trust to Bouldin and Roper for her benefit — a deed which he might easily have gotten out of his way by paying the money due her, according to his contract. But this objection of laches comes with. *127 an ill grace from Mayo, who slept so long upon his own rights. Perhaps no party m these canses has been guilty of greater laches than Mayo, and it would be difficult for him to maintain his suit against such an objection without the aid which he derives from the claim of Jane Coutts. Under all the circumstances of the case we think the objection to her suit on the ground of laches and lapse of time ought not to be sustained.
And now there is but one remaining question to be considered, and that is raised by Jane Coutts’ representative, who contends that the Circuit court erred in allowing credit to Mayo for the sum of $3906 96, paid by him on the 5th of December 1823, in discharge of the three negotiable notes secured by the deed of trust to Coleman and Otis; and insists that a decree should have been rendered for the whole amount of the ten thousand dollars with interest. Upon this question we have had great difficulty, and there is certainly great force in the argument against the propriety of allowing the credit. But our conclusion on the subject after the best consideration we have been able to . give it is, that the credit ought to be allowed. We cannot account for the delay in claiming any installments of the pui’chase money, even the $500 which were to be paid on the execution of the deed, except upon the hypothesis that the said sum of $3906 96 was an, advance payment on account of the purchase money. That well accounts for the delay of several years which occurred before the institution of the suit of Jane Coutts. There is a difficulty, on the other hand, in this; that the deed to Mayo conveys the property subject to the deed of trust to Coleman and Otis, and it is plausibly insisted that the conveyance was subject to both debts secured by the deed; that is, the three negotiable notes called the Mick’s debt and the debt to Winston. But a sufficient answer to this *128 seems to be that the Mick’s debt must be considered as having been paid eo instanti with the execution of the deed to Mayo. The first step contemplated to be taken in the arrangement between Patrick Coutts and Mayo was, the payment of that debt, which was necessary to stop the sale. The execution of the deed and the delivery of the check to Coutts by Mayo were probably contemporaneous acts, or intended to be so. It is not probable therefore that the property would have been conveyed subject to a debt which was discharged at the very instant of the conveyance. It is more probable that in executing the conveyance that debt ivas regarded as paid, and the debt to Winston was the only debt referred to in making the conveyance subject to the deed of trust to Coleman and Otis. The Mick’s debt, and the deed of trust so far as it secured that debt, were released by the attorney of the creditor on the 5th of December, when the debt was paid by Mayo’s check. All these acts were no doubt regarded as contemporaneous, and the parties could hardly have intended to recognize the continued existence of that debt.
In regard to the four lots in Manchester, Hos. 306, 307, 308, and 309, for which credit is claimed by Mayo’s representatives, upon the ground that they had been sold under a deed of trust from P. Coutts to Coleman and Woolfolk before they were included in the deed to Mayo of the 1st of December 18^3, it is probable that they were of little or no value, as they were sold only at five dollars each at the said sale, and there is no evidence of their value in the record. Ho further notice, therefore, will be taken of them. If the sale by P. Coutts to Mayo was with the understanding between them, as seems to have been the case, that the contract for the purchase money, subject only to the credit aforesaid, should be assigned to Jane Coutts, to. prevent any claim by her against the pro *129 perty under the deed of trust to Bouldin and Eoper; then Mayo would have no claim against her, or the balance of the purchase money assigned to her, on account of any defect in the title to the said lots, but his only remedy would be against P. Coutts on the covenant, of warranty.
We therefore concur in opinion with commissioners Cary and Evans and the Circuit court, that the true consideration of the said deed to Mayo of the 1st of December 1828, was the said sum of ten thousand dollars, with interest on the several installments aforesaid as they became due as aforesaid, and that the said sum of $3906 96 should be applied as a credit thereon as of the 5th day of December 1823. We are of opinion that the amount of said purchase money and interest, subject only to the said credit, is still due and payable to the present representative of Jane Coutts, who was assignee.of Patrick Coutts as aforesaid, and there is a lien therefor on the reversionary interest of said Mayo in said property; and there ought to be a decree for an account to ascertain the balance due of said purchase money after applying said credit, and for the payment of the same with interest by the personal representative of said Mayo, and if not paid in a reasonable time thereafter, then there ought to be a decree for the sale of the said reversionary interest, or so much thereof as may be necessary for the payment of said balance and interest.
The result is, that so much of the decrees in the said three suits as is in conflict with the foregoing opinion, must be reversed, and the residue affirmed, and the causes remanded to the Circuit court for further proceedings therein in conformity with the said opinion.
The other judges concurred in the opinion of Mon-curb, P.
Beversed in part and aeeirmed in part.